**IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF GEORGIA
MACON DIVISION**

| | | |
|---|---|---|
| **A.H.,** | : | |
| | : | |
| **Plaintiff,** | : | |
| | : | |
| **v.** | : | **No. 5:23-cv-28 (CHW)** |
| | : | |
| **COMMISSIONER OF SOCIAL** | : | |
| **SECURITY,** | : | **Social Security Appeal** |
| | : | |
| | : | |
| **Defendant.** | : | |
| | : | |

## <u>ORDER</u>

This is a review of a final decision of the Commissioner of Social Security denying Plaintiff A.H.'s application for benefits under Title II of the Social Security Act.  The parties consented to have a United States Magistrate Judge conduct all proceedings in this case, and as a result, any appeal from this judgment may be taken directly to the Eleventh Circuit Court of Appeals in the same manner as an appeal from any other judgment of the United States District Court.  Plaintiff presented new and material evidence which undermined the ALJ's decision, and the Appeals Council improperly rejected this evidence. Accordingly, the Commissioner's decision in Plaintiff's case is **REMANDED** under sentence six of 42 U.S.C. § 405(g) for consideration of that evidence.

### BACKGROUND

 Plaintiff filed an application for disability insurance benefits under Title II of the Social Security Act on March 17, 2020, alleging a disability onset date of October 1, 2018.  R. 114. Plaintiff's claim was denied initially and upon reconsideration.  *Id.*  Plaintiff attended a hearing

before an Administrative Law Judge ("ALJ") on July 23, 2021. R. 111-31.  On April 26, 2022, the ALJ issued a decision finding that Plaintiff was not disabled.  R. 137-69.  On November 30, 2022, the Appeals Council denied Plaintiff's request for review.  R. 1-7.  Plaintiff filed the present action on January 24, 2023, seeking judicial review of the ALJ's decision.  (Doc. 1).

## STANDARD OF REVIEW

Judicial review of a decision of the Commissioner of Social Security is limited to a determination of whether that decision is supported by substantial evidence, as well as whether the Commissioner applied the correct legal standards. *Winschel v. Comm'r of Soc. Sec.*, 631 F.3d 1176, 1178 (11th Cir. 2011). "Substantial evidence" is defined as "more than a scintilla," and as "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Id.* The Eleventh Circuit has explained that reviewing courts may not decide the facts anew, reweigh the evidence, or substitute their judgment for that of the Commissioner. *Id.* Rather, if the Commissioner's decision is supported by substantial evidence, that decision must be affirmed even if the evidence preponderates against it.

## EVALUATION OF DISABILITY

Social Security claimants are "disabled" if they are unable to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months. 42 U.S.C. § 423(d)(1)(A).

The Social Security Regulations outline a five-step sequential evaluation process for determining whether a claimant is disabled: "(1) whether the claimant is currently engaged in substantial gainful activity; (2) whether the claimant has a severe impairment or combination of impairments; (3) whether the impairment meets or equals the severity of the specified

impairments in the Listing of impairments; (4) based on a residual functional capacity ("RFC") assessment, whether the claimant can perform any of his or her past relevant work despite the impairment; and (5) whether there are significant numbers of jobs in the national economy that the claimant can perform given the claimant's RFC, age, education, and work experience." *Winschel*, 631 F.3d at 1178 (11th Cir. 2011) (citing 20 C.F.R. §§ 404.1520(a)(4)(i)-(v); 416.920(a)(4)(i)-(v)).

## MEDICAL RECORD

Plaintiff was admitted to the emergency department at Grady Hospital on October 13, 2018, after an accident in which she fell five to six feet after a deck she was standing on collapsed. R. 508-10. Plaintiff reported severe right sided chest, arm, abdominal, midline neck, and leg pain. R. 509. No acute traumatic injuries were found upon imaging and evaluation, and Plaintiff's pain improved after treatment. *Id.*

At a follow up appointment on October 24, 2018, at the Accident Centers of Atlanta, Plaintiff reported significant pain in her neck, upper back, mid-back, lower back, arms, hips, chest, and legs. R. 449. Plaintiff described her symptoms as stiffness, throbbing, aching, and soreness. *Id.* Plaintiff rated her symptoms at a nine out of ten and reported that chiropractic therapy and pain medicine improved her symptoms. *Id.* Lying down, moving her joints, and sitting made the symptoms worse. *Id.* On examination, muscle tenderness was found in Plaintiff's right leg, hip, shoulder, cervico-thoracic region, and thoraco-lumbar region. R. 450. Plaintiff had decreased range of motion and pain in her right hip, shoulder, cervico-thoracic region, and thoraco-lumbar region. *Id.*

On November 1, 2018, Plaintiff had an MRI scan taken of her cervical spine. R. 487. The MRI scan revealed that Plaintiff's posterior fosse structures were normal, her cervical cord

structures were normal, and there was loss of the normal lordotic curvature of the cervical spine. *Id.* No prevertebral or paravertebral masses or fluid collections were identified. *Id.* The imaging showed bulging of the disc at C3-4, C5-6, and C6-7, resulting in an anterior impression on the thecal sac. *Id.* At C4-5, there was a left paracentral/neural foraminal disc herniation superimposed on a disc bulge. *Id.* There were osteophytes present, and the disc herniation extended beyond the osteophytes consistent with a more recent herniation of the disc superimposed on chronic degeneration. *Id.* The disc herniation indented the ventral thecal sac and elevated the posterior longitudinal ligament and impinged onto the existing left C5 nerve. *Id.* There was severe asymmetric left-sided spinal canal stenosis measuring 0.4 cm with mild spinal cord deformity. *Id.* There was also moderate left and mild right neural foraminal stenosis. *Id.*

On November 3, 2018, Plaintiff had an MRI taken of her lumbar spine. R. 485. The MRI scan revealed lumbosacral transitional vertebral anatomy with lumbarization of the S1 vertebral body. *Id.* Plaintiff's conus medullaris appeared normal, and there was loss of the normal lordotic curvature of the lumbar spine. *Id.* There was no evidence of abnormal solid or cystic lesions. *Id.* There was bulging of the L2-3, L3-4, L4-5, and L5-S1 discs. *Id.* As a result of the bulging discs, there was an anterior impression on Plaintiff's thecal sac, as well as patchy edema superimposed on bilateral facet hypertrophic changes with osteophytes on discs L4-5 and L5-S1. *Id.*

Plaintiff reported continued arm, chest, hip, leg, lower back, mid-back, upper back, and neck pain from her fall in October at an appointment on November 6, 2018. R. 464. Plaintiff was taking oxycodone and cyclobenzaprine at the time. R. 467. Chiropractic therapy and pain medicine improved her symptoms, while moving made her symptoms worse. *Id.* Examination

found muscle tenderness in Plaintiff's right leg, hip, and shoulder; cervico-thoracic region, thoraco-lumbar region, and lumbo-sacral region.  R. 465.  Muscle spasms were found in her cervico-thoracic region and thoraco-lumbar region, as well as decreased and painful range of motion in her right hip, right shoulder, cervico-thoracic region, and thoraco-lumbar region.  *Id.*  Plaintiff's prognosis was designated as fair.  *Id.*  Plaintiff reported similar symptoms and examination found similar findings on November 12, 2018, and her prognosis continued to be fair.  R. 470-71.

Plaintiff returned to Grady Hospital on May 1, 2019, requesting a referral to an orthopedic clinic for pain.  R. 551-54.  Plaintiff's behavior was noted to be hostile and agitated, but her physical examination showed that she was oriented to person, place, and time; her neck's range of motion was normal; her cardiovascular function was normal; she had a steady, slow gait; she experienced diffuse spinal tenderness from her C-spine to her lumbar spine with no bony deformity, erythema, or warmth skin intact; she had cervical adenopathy; she had a full flexation  decrease in her lower extremity reflexes; she had a lumbar disc bulge; and multiple C-spine disc herniations.  *Id.*  Plaintiff was discharged with a prescription for her pain and a referral for neurosurgery.  R. 555.

On May 19, 2019, Plaintiff visited Dr. Shahram Rezaiamiri at South Atlanta Neurosurgery.  R. 494.  Plaintiff rated her neck pain a six out of ten and was noted to be midline and non-radiating.  *Id.*  She rated her lower back pain a nine out of ten, above the belt, and non-radiating with bilateral hip pain.  *Id.*  Plaintiff reported having neck pain, headaches, and anxiety.  R. 495.  Plaintiff's physical examination showed that her upper and lower extremities scored five out of five strength bilaterally and symmetrically.  *Id.*  Palpation revealed hypertonicity of her lumbar paraspinals bilaterally and tenderness over the facets bilaterally for her L3-S1 discs.  *Id.*

Plaintiff also had cervical tenderness over her upper trapezius bilaterally.  *Id.*  Plaintiff had cervical disc displacement at her C5-C6 and C6-C7 levels.  *Id.*  Plaintiff was prescribed Norco tablets as needed and scheduled for a follow up appointment in four weeks.  *Id.*

Plaintiff visited Atlanta Medical Center Hospital South's emergency department on May 23, 2019.  R. 653.  Plaintiff described her pain as moderate, with symptoms aggravated by bending and by certain positions.  *Id.*  At this time, Plaintiff was prescribed mexloicam, methocarbamol, and tramadol.  R. 654.  Plaintiff's neck had a normal range of motion; her hips had a decreased range of motion with normal strength and no tenderness or swelling; her cervical back exhibited normal range of motion, no tenderness, and no swelling; her thoracic back exhibited normal range of motion, no tenderness, and no swelling; and her lumbar back exhibited decreased range of motion, tenderness, and pain.  *Id.*

Plaintiff returned to Dr. Rezaiamiri on June 6, 2019, for epidural steroid injections, but she had to leave her appointment because of a family emergency and did not receive any injection.  R. 496.  Plaintiff requested Percocet on the basis that hydrocodone was not relieving her pain.  *Id.*  Plaintiff was prescribed Percocet and was recommended for physical therapy and/or chiropractic care, but Plaintiff wanted her pain levels to reduce before attempting physical therapy.  R. 497.  Plaintiff returned to Dr. Rezaiamiri on July 13, 2019, and received a lumbar epidural steroid injection.  R. 498.  Plaintiff was denied additional pain medication and instructed on the use of Aleve and ibuprofen for additional pain management.  *Id.*

Plaintiff visited All Spine Surgery Center on August 15, 2019, and received a fluoroscopic guided epidural steroid injection.  R. 504.  Plaintiff returned to Dr. Rezaiamiri again on August 29, 2019.  R. 500.  Plaintiff's MRI results indicated multilevel degenerative disc disease, and Plaintiff reported severe pain.  *Id.*  Plaintiff was referred to a pain clinic for better

pain management.  *Id.*  Plaintiff returned to Dr. Rezaiamiri on September 26, 2019, and reported that the pain management clinic she was referred to would not see her.  R. 502.  Plaintiff continued to request additional pain relief and explained that she had visited an orthopedic surgeon who recommended surgery.  R. 503.  Plaintiff was referred to another pain management clinic and was discharged from South Atlanta Neurosurgery.  *Id.*

Plaintiff went to Peachtree Orthopedic Clinic on September 23, 2019.  R. 884.  Plaintiff's MRI was assessed as showing normal age-appropriate degeneration in her lumbar region and a cervical protrusion at C4-C5.  *Id.*  Plaintiff reported pain with extended activities, full range of motion and strength, but self-limitation due to pain.  *Id.*  Plaintiff was assessed as being able to benefit from skilled physical therapy to help normalize her movement and her rehabilitation potential was noted to be good.  *Id.*  At this time, Plaintiff was taking cyclobenzaprine hydrochloride, gabapentin, ibuprofen, meloxicam, oxycodone, and tramadol.  R. 885.  On September 30, 2019, Plaintiff returned to Peachtree Orthopedic and was given a set of therapeutic exercises to develop her strength, range of motion, and flexibility.  R. 879.

Plaintiff returned to Grady Hospital on December 10, 2019, reporting back pain and bilateral lower extremity pain.  R. 574.  Plaintiff sought treatment in the emergency department on January 6, 2020, because of lower back pain and shooting pains in her right leg.  R. 640.  Plaintiff visited Dr. Ahmad Jingo on February 6, 2020, reporting continued lower back pain.  R. 610.  Upon examination, Dr. Jingo noted tenderness in the lower back, limited range of motion in the lumbar spine related to degenerative disc disease, and Plaintiff's use of a cane.  R. 612.  At this time, Plaintiff's medications were Cymbalta, Skelaxin, celecoxib, and Percocet.  R. 610.  Plaintiff received a trigger point injection in her right lumbar paraspinal muscle.  R. 613.  Plaintiff returned to physical therapy on January 30, 2020, and tenderness upon palpation along

her bilateral sacroiliac joint was noted.  R. 609.  During this visit, Plaintiff also reported experiencing depression and excessive stress.  R. 607.  Plaintiff went to physical therapy again on February 20, 2020, continuing to report upper, mid, and lower back pain.  R. 614.

Plaintiff returned to Dr. Jingo on March 6, 2020, and was assessed as benefiting from opioid pain relief therapy, as she was able to perform activities that were previously impossible because of pain.  R. 622.  Invasive treatment options were discussed, but Plaintiff declined them after expressing doubt about better outcomes.  *Id.*  Plaintiff continued to report experiencing depression and excessive stress, as well as mood changes.  R. 621.  Plaintiff visited Dr. Jingo again on July 7, 2020, reporting that she was able to return to some but not all normal activities. R. 730.  Her pack pain was severe, specifically a seven or eight out of ten on the pain scale, and had been since her last visit.  *Id.*  Plaintiff's back pain prevented her from sleeping, affected her daily activities, and affected her ability to work.  *Id.*  Upon examination, Plaintiff's cervical spine had abnormal tenderness, her spinal curves were normal, her range of motion was abnormal, her muscle strength testing was five out of five in all major muscle groups, and special tests for nerve root diseases were negative.  R. 733.  Plaintiff's lumbar spine had tenderness as well, her range of motion was abnormal, her muscle strength testing was a four out of five in all major muscle groups, and special tests for nerve root diseases were negative.  *Id.*  Plaintiff's current medications were continued, and Plaintiff was instructed to eat a healthy diet, exercise, and follow up again in a month.  R. 734.

Plaintiff received a psychological evaluation from Scott A. Duncan, a licensed psychologist, on July 30, 2020.  R. 725.  Plaintiff reported that she began seeing a counselor as part of her first time being treated for mental health issues in February 2020.  R. 726.  Plaintiff reported that she experienced depression with symptoms of irritability, being socially withdrawn,

being unable to sleep, "zoning out," and occasionally hearing voices.  *Id.*  Dr. Duncan assessed Plaintiff as having no symptoms consistent with any mental health diagnosis and as malingering when describing her symptoms of poor memory and psychosis.  R. 728.

Plaintiff returned to Dr. Jingo in October 2020, again reporting that she was able to return to some but not all of her normal activities and that her back pain was severe at a seven to eight out of ten on the pain scale.  R. 750.  Upon examination, Plaintiff's cervical spine remained abnormal upon palpitation, with tenderness, abnormal range of motion, and muscle strength of four out of five in all major muscle groups.  R. 751.  Plaintiff's lumbar spine also remained tender, with an abnormal range of motion, muscle strength of four out of five in all major muscle groups, and negative results for nerve root disease tests.  *Id.*  Plaintiff returned to Dr. Jingo for another follow-up appointment in November 2020, reporting similar symptoms with increased pain at a nine out of ten on the pain scale.  R. 756.  Plaintiff returned to Dr. Jingo again in December 2020 reporting pain that completely prevented her from completing general activities, walking, and sleeping.  R. 760.  Inspection and palpation of Plaintiff's cervical spine was within normal limits, with tenderness, range of motion within normal limits, muscle strength testing at four out of five for all major muscle groups, and negative tests for nerve root disease.  R. 762. Plaintiff's lumbar spine was also within normal limits upon inspection and palpation. Dr. Jingo noted tenderness, abnormal range of motion, muscle strength testing at four out of five in all major muscle groups, and special tests for nerve root disease were negative.  *Id.*  Plaintiff was instructed to manage her diet and to exercise regularly, with at least thirty minutes of physical activity per day.  R. 763.

Plaintiff returned to Dr. Jingo again in January 2021, reporting continued neck, lower back, and leg pain.  R. 764.  Plaintiff's worst pain in the last month had been a seven to eight out

of ten and her lowest pain had been a three to four out of ten. *Id.* On average, she reported her pain had been moderate at a five to six out of ten on the pain scale. *Id.* Plaintiff reported that her pain seriously interfered with general activities, definitely affected her mood, mildly interfered with walking, definitely interfered with normal work, mildly interfered with interpersonal relationships, mildly interfered with sleep, mildly interfered with enjoyment of life, and definitely interfered with concentration. *Id.* Inspection and palpation of Plaintiff's cervical spine was abnormal and revealed tenderness. R. 765. Plaintiff's range of motion in her cervical spine was abnormal, her muscle strength testing was five out of five in all major muscle groups, and special tests for nerve root diseases were negative. *Id.* Inspection and palpation of Plaintiff's lumbar spine was normal, there was tenderness, the range of motion was abnormal, muscle strength testing was four out of five for all major muscle groups, and special tests for nerve root diseases were negative. R. 766.

Plaintiff returned to Dr. Jingo and reported stabbing back pain and aches that radiated into her leg on February 4, 2021. R. 799. On March 4, 2021, Plaintiff returned to Dr. Jingo reporting similar symptoms of pain in her neck, lower back, and leg. R. 791. Inspection and palpation of Plaintiff's cervical spine was within normal limits, there was tenderness, the range of motion was within normal limits, and muscle strength testing was five out of five in all major muscle groups. R. 793. Inspection and palpation of Plaintiff's lumbar spine was also within normal limits, there was tenderness, the range of motion was within normal limits, and muscle strength testing was five out of five in all major muscle groups. *Id.* Plaintiff returned to Dr. Jingo on April 5, 2021, and reported sharp pain in her lower back and leg. R. 794. Inspection and palpation of Plaintiff's lumbar spine were not within normal limits, and there was erythema, edema, deformity, or tenderness. R. 795. Plaintiff's spinal curves were not normal. *Id.*

Plaintiff's muscle strength testing was five out of five in all major muscle groups.  *Id.*  Plaintiff was offered an invasive treatment option but declined because she doubted having a better outcome.  R. 796.  Plaintiff continued to report depression, excessive stress, mood changes, and behavioral changes.  R. 800.

Plaintiff presented at WellStar Urgent Care for lower back, upper back, and neck pain on April 20, 2021.  R. 815.  Plaintiff reported that her pain level was a ten out of ten, and that she had tried using heating pads, ice, and NSAIDS to improve her symptoms with no success.  *Id.* Plaintiff was prescribed acetaminophen-codeine and prednisone.  R. 820.  Plaintiff went to Piedmont Fayette Hospital's Emergency Department on May 1, 2021, after experiencing intense pain and difficulty lifting her left arm because of the pain.  R. 828.  These symptoms began on April 19, 2021, when Plaintiff had her hair braided, causing her to sit in a chair for six hours and have long braids rest on her neck during that period.  *Id.*  Plaintiff had run out of her oxycodone prescription and reported that she had gone to urgent care the day before and had received medication and a prescription for Tylenol with codeine and prednisone, which she had begun taking that day.  *Id.*  An x-ray of Plaintiff's left shoulder showed normal alignment without significant degenerative changes.  R. 836.  An x-ray of Plaintiff's cervical spine showed normal alignment with mild disc height loss and minimal osteophyte formation at C4-C5 discs.  *Id.* Plaintiff also had mild anterior osteophyte formation with preserved disc space and limbus vertebra at C5-C6 discs.  *Id.*  The overall impression of Plaintiff's cervical spine indicated mild degenerative changes at C4-C6.  R. 836.  Plaintiff was given methocarbamol and oxycodone-acetaminophen for her symptoms and was discharged.  R. 834.

Plaintiff had a telehealth visit Emory Healthcare on May 27, 2021.  R. 841.  Plaintiff reported that she had pulled a heavy object three weeks before this appointment and that this

activity had aggravated her symptoms.  R. 842.  Plaintiff characterized her pain as a nine out of ten, but a four or five out of ten with opioid medication.  *Id.*  Turning her head to the right caused pain in her neck, shoulder, and arm, and Plaintiff described her pain as sharp, stabbing, dull, and aching with numbness, tingling, burning, and spasming.  *Id.*  Plaintiff had been referred for aquatherapy but had not yet begun treatment.  *Id.*  Plaintiff's cervical range of motion had reduced flexion with pain in the back of her neck.  R. 843.  Plaintiff's lateral rotation to the left was intact, but rotation to the right caused pain and discomfort.  *Id.*  Plaintiff's left shoulder had decreased internal and external range of motion, reduced abduction to approximately ninety degrees, and reduced forward flexion to approximately forty-five degrees.  *Id.*  An MRI was ordered, and Plaintiff was prescribed diclofenac 1% topical gel for pain.  R. 844.

Plaintiff received an MRI scan of her cervical spine on July 9, 2021.  R. 867.  The MRI showed reversible normal cervical lordosis and multilevel disc desiccation without loss of disc space height in Plaintiff's intervertebral discs.  *Id.*  Plaintiff's C2-C3, C3-C4, C5-C6, and C6-C7 discs showed disc-osteophyte complex and facet hypertrophy without spinal canal or neural foraminal stenosis.  R. 868.  Plaintiff's C4-C5 discs showed left-sided subarticular and foraminal disc extrusion contracting with superior migration contracting the exiting C5 nerve root and disc-osteophyte complex and facet hypertrophy with moderate spinal canal stenosis and moderate right and severe left neural foraminal stenoses.  *Id.*  Plaintiff's C1-C2 and C7-T1 discs were normal.  *Id.*  The degenerative changes were worst at the C4-C5 level, with a large extruded disc, resulting in severe left neuroforaminal narrowing and likely impinging on the left C5 nerve root.  *Id.*  The images also showed moderate central spinal canal stenosis and moderate right neuroforaminal narrowing at the C4-C5 level.  *Id.*  Plaintiff's MRI results were evaluated by Dr. Travis Coats on July 12, 2021.  R. 860.  Dr. Coats opined that the large disc herniation revealed

in the MRI could be leading to compression of the nerves in the neck that supply Plaintiff's left arm, which could explain Plaintiff's current symptoms as well as why Plaintiff's current medications and previous trigger point injections had not successfully managed her symptoms. *Id.* Dr. Coats noted that an epidural or surgical referral could be options for further treatment of Plaintiff's symptoms. *Id.*

*Hearing Testimony*

At her hearing before the ALJ, Plaintiff described her symptoms as sharp pain, chronic pain, burning sensations, throbbing, stabbing pain, inflamed tissue, ankle swelling, numbness, tingling, pins and needles sensations, muscle aches, muscle spasms, and muscle weakness. R. 153. Plaintiff testified that she experienced these symptoms in her neck, left shoulder, left arm, both thighs, mid-back, lower back, and legs, and explained that they increased with activity. *Id.* Specifically, walking for a long time, sitting for a long time, standing for a long time, squatting, bending, and lifting exacerbated Plaintiff's symptoms. R. 154. Plaintiff estimated that she could sit for thirty minutes to an hour, stand for fifteen to thirty minutes, and walk for ten minutes before needing a break. *Id.*

Plaintiff testified that her typical day began with taking her pain medication and included researching her injuries for pain management techniques, watching television, sitting in her room, and napping for two to three hours. *Id.* She would take more medication around noon and try to move around by doing household chores like washing dishes and vacuuming. R. 155. Plaintiff explained that she was now unable to take family trips, attend social gatherings and parties, dance, or otherwise exercise. *Id.* Plaintiff described herself as being confined to her house all day. *Id.* Plaintiff's ability to complete household chores was also affected by her pain, as she had reinjured her neck while vacuuming. R. 155-56. Plaintiff's range of motion in her

left arm was now limited, and she could no longer lift her arm over her head.  R. 156.  Since her

vacuuming reinjury, Plaintiff had been afraid to do more chores because of the risk of further

injury.  *Id.*  Plaintiff's ability to dress herself was also impacted by her injuries, as she could not

put on jeans by herself, and she had to wear stretchy pants and flat shoes for comfort.  *Id.*

Plaintiff's mother helped her by preparing food, washing clothes, and dressing her.  *Id.*  Plaintiff

lifted nothing at home after her reinjury, and previously, she had lifted no more than five to ten

pounds.  R. 157.

Plaintiff experienced side effects as a result of her medication, including headaches,

blurry vision, anxiety, depression, mood changes, difficulty sleeping, vomiting, nausea,

constipation, lightheadedness, dizziness, dry mouth, and drowsiness.  *Id.*  Plaintiff's doctors told

her that the only other option for pain management other than her medication was surgery, but

Plaintiff was "afraid to have that [neck] surgery."  *Id.*  Plaintiff explained that she had been in a

car accident in 1998 in which her pelvis was fractured on her right side.  *Id.*  Plaintiff was told

that she would not walk again, she had a screw inserted into the right side of her pelvis, and she

had two surgeries to manage her injury.  *Id.*  Plaintiff did recover and was able to return to work,

but after falling through a deck in 2018, she could not "shake th[e] pain off."  R. 158.

## DISABILITY DETERMINATION

Following the five-step evaluation process, the reviewing ALJ made the following

findings.  At step one, the ALJ found that Plaintiff had not engaged in substantial gainful activity

since her alleged onset date, October 1, 2018.  R.117.  At step two, the ALJ found that Plaintiff

had the following severe impairments: cervical degenerative disc disease, lumbar degenerative

disc disease, fracture of the left superior and inferior pubic rami status post-open reduction

internal fixation and fusion of the right sacroiliac joint, degenerative joint disease in the right

knee, obesity, and bilateral carpal and cubital tunnel syndrome. *Id.* At step three, the ALJ found that Plaintiff did not have an impairment that met or medically equaled the severity of one of the listed impairments in 20 C.F.R. Part 404, Subpart P, Appendix 1. R. 119-21. Before evaluating Plaintiff at step four, the ALJ assessed Plaintiff's residual functional capacity ("RFC") and found that Plaintiff had the RFC to perform sedentary work as defined in 20 C.F.R. § 404.1567(a) with the following additional limitations: she can lift and carry 10 pounds occasionally and less than 10 pounds frequently; she can sit with normal breaks for a total of six hours of an eight-hour workday; she can stand and/or walk with normal breaks for a total of two hours in an eight-hour workday; she needs to be able to alternate between sitting and standing at her work station while completing the task at hand once per hour for five minutes; she can push or pull as much as she can lift or carry; she can never operate foot controls; never climb ladders, ropes, or scaffolds; she can occasionally climb ramps and stairs; she can occasionally balance as defined in the Selected Characteristics of Occupations to the Dictionary of Occupational Titles; she can occasionally stoop, crouch, and kneel; she can never crawl; she can occasionally reach overhead but frequently reach in all other directions; she can occasionally be exposed to extreme heat, extreme cold, and vibration; she can never be exposed to dangerous chemicals, unprotected heights, or open moving mechanical parts and hazardous machinery; she needs to use a handheld assistive device such as a cane when ambulating away from her work station. R. 121-29. At step four, with the benefit of testimony from a vocational expert, the ALJ found that Plaintiff could not perform her past relevant work. R. 129. At step five, again with the benefit of vocational expert testimony, the ALJ found that there were additional jobs that existed in significant numbers in the national economy that Plaintiff could perform, such as lens inserter, document preparer, and

envelope addresser.  R.130-31.  Accordingly, the ALJ found that Plaintiff was not disabled.  R. 131.

**ANALYSIS**

Plaintiff argues that remand is appropriate because (1) the ALJ formulated the RFC improperly and without the support of substantial evidence, and (2) the Appeals Council improperly rejected new and material evidence.  (Doc. 10 at 12, 18).  For the following reasons, Plaintiff's argument that the ALJ formulated the RFC improperly is meritless, but Plaintiff's case should be remanded under sentence six of 42 U.S.C. § 405(g) because the Appeals Council improperly rejected Plaintiff's new and material evidence related to her mental health.

1. *The ALJ's formulation of the RFC based upon the evidence before her is supported by substantial evidence*

Plaintiff argues that the physical RFC is not supported by substantial evidence, because the ALJ found the medical opinions related to Plaintiff's physical health "not very persuasive." (Doc. 10 at 18).  Plaintiff contends that the ALJ impermissibly relied on her own lay judgment of the medical evidence when making this determination.  *Id.*  However, the ALJ is required to exercise her judgment when assessing a claimant's RFC.  *See Moore v. Soc. Sec. Admin., Comm'r.*, 649 Fed. App'x. 941, 945 (11th Cir. 2016) ("[Claimant] argues that the [ALJ] 'substituted her opinion for' that provided by [the doctor], but the task of determining a claimant's residual functioning capacity and ability to work rests with the [ALJ], not a doctor.") (citing 20 C.F.R. § 404.1546(c)).  The ALJ found that certain medical opinions were not persuasive, a statement which Plaintiff contests, arguing that "[a]n ALJ is not empowered to come to a judgment on a plaintiff's capacities based on a lay reading of the medical evidence." (Doc. 10 at 18).  Plaintiff has not offered detailed argument on this point, but she does include

several case citations.  In one cited case, an ALJ lacked substantial evidence to support the decision, in another the ALJ applied conditions absent from the plain language of the relevant section when making his determination, and in the final cited case, the ALJ relied upon the claimant's lack of appearance of pain at the hearing rather than the medical evidence.  (Doc. 10 at 18, *citing Miller v. Colvin*, 2015 WL 5601868 *23 (N.D. Ga. Sep. 23, 2015); *Graham v. Bowen,* 786 F.2d 1113, 1115 (11th Cir. 1986); *Freeman v. Schweiker*, 681 F.2d 727, 731 (11th Cir. 1982)).  No such circumstances or substitutions of judgment are present in this case, and as explained below, substantial evidence supports the ALJ's decision.

Plaintiff also argues that the ALJ "cherry-picked" the record and mischaracterized evidence.  (Doc. 10 at 18).  Plaintiff points to the ALJ's references to Plaintiff's use of prescription medication to manage her symptoms as "conservative" treatment, to indications that Plaintiff's pain improved with medication, and to Plaintiff's failure to attend prescribed aquatherapy as instances of cherry-picking and mischaracterization.  (*Id.* at 19).  The record shows, however, that Plaintiff's treatment was conservative, in the sense that several more invasive procedures were discussed and recommended, and Plaintiff refused them in favor of continuing treatment with medication.  R. 622; 860; 157.  The medical evidence also shows that Plaintiff reported that her medication improved her pain on multiple occasions.  R. 449; 467; 470-71; 622; 842.  Plaintiff contends that she "relies on potent medication" to refute that medication improved her pain, but this contention does not undermine the substantial evidence that supports the ALJ's findings or decision.  Finally, although it is true that Plaintiff explained she was unable to attend aquatherapy due to insurance issues in the hearing before the ALJ, this does not undermine the rest of the substantial evidence which supports the ALJ's findings and ultimate decision.  (Doc. 10 at 19); R. 161.

Although Plaintiff argues that "the ALJ failed to link the limitations included in the RFC to any substantial evidence," the ALJ relied upon substantial evidence in issuing her decision. The ALJ looked to Plaintiff's cervical and lumbar MRIs, which showed Plaintiff had mild degenerative changes in her spine.  R. 485-88; 500; 612; 622; 886-88; 831.  Although Plaintiff notes that the ALJ was mistaken about the date of Plaintiff's MRI, Plaintiff does not specifically disagree with the ALJ's assessment beyond arguing that the ALJ was mistaken to claim that Plaintiff's imaging studies show improvement.  (Doc. 10 at 19).   Taken in context, however, the ALJ's statement indicates that the ALJ was referring to Plaintiff's MRI study showing "degenerative disc changes but no frank disc herniation or stenosis and normal age appropriate degeneration in lumbar and cervical protrusion at C4-C5" and to Plaintiff's May 2021 x-ray of her cervical spine which showed "normal alignment, 'mild' disc height loss, and 'minimal' osteophyte formation, with preserved disc space and limbus vertebra at C5-6, with an impression of 'mild' degenerative disc changes at C4-6."  R. 123.  Although Plaintiff may disagree with the ALJ's characterization of "improvement" specifically, the ALJ's broader point about relatively mild findings from Plaintiff's MRI and imaging are supported with specific citations to Plaintiff's MRI and imaging results.  *Id.*  These results constitute substantial evidence which supports the ALJ's decision.  Contrary to Plaintiff's argument and legal citation, the ALJ's characterization of "improvement," which was part of a broader assessment that Plaintiff's pain was being managed by her medications, does not amount to the ALJ improperly "interpret[ing] the MRI studies and translat[ing] them into corresponding functional limitations."  (Doc. 10 at 19) (citing *Sweeney v. Comm'r of Soc. Sec.*, 2023 WL 2071383 *3 (M.D. Fla. Feb. 17, 2023))).

Although Plaintiff raises several issues with the ALJ's reasoning in making the decision in this case, Plaintiff essentially only points to certain pieces of evidence that support her

arguments.  Under the standards, this is insufficient, as the claimant "must do more than point to evidence in the record that supports her positions; she must show the absence of substantial evidence supporting the ALJ's conclusion."  *Sims v. Comm'r. of Soc. Sec.*, 706 F.App'x. 595, 604 (11th Cir. 2017).  "Even if the evidence preponderates against the Commissioner's findings, the court must affirm if the decision reached is supported by substantial evidence."  *Ellison v. Barnhart*, 355 F.3d 1272, 1275 (11th Cir. 2003).  Such is the case here.  Accordingly, remand is not appropriate based upon the ALJ's assessment of Plaintiff's RFC based upon the record at the time of the decision.

2. *The Appeals Council improperly rejected Plaintiff's new and material evidence related to her mental health from Dr. Wright, but properly rejected new evidence from Dr. Jingo*

Plaintiff argues that the Appeals Council improperly rejected new and material evidence which undermines the ALJ's decision.  (Doc. 10 at 13).  Specifically, Plaintiff contends that the Appeals Council's summary rejection of evidence from Dr. Brian D. Wright, other mental health records, and an updated opinion from Dr. Jingo was improper.  (*Id.*)  Plaintiff submits that her new mental health records and the opinion of Dr. Wright undermine the ALJ's determination that Plaintiff's mental health impairments were non-severe and challenge the ALJ's failure to include mental health limitations in the RCF, while the updated opinion from Dr. Jingo supports greater work preclusive physical limitations.  (*Id.*)

"With a few exceptions, the claimant is allowed to present new evidence at each stage of this administrative process," including before the Appeals Council.  *Ingram v. Comm'r of Soc. Sec. Admin*, 496 F.3d 1253, 1261 (11th Cir. 2007).  The Appeals Council "must consider new, material, and chronologically relevant evidence" presented by the claimant.  *Id.*  Evidence is new

when "it was not previously before the ALJ," evidence is material when "there is a reasonable possibility that the new evidence would change the administrative outcome" of the case, and evidence is chronologically relevant if it relates to the time of or before the date of the ALJ's decision. *Hyde v. Bowen*, 823 F.2d 456, 459 (11th Cir. 1987); *Hargress v. Comm'r of Soc. Sec.*, 883 F.3d 1302, 1309 (11th Cir. 2018). "When a claimant properly presents new evidence, and the Appeals Council denies review, the Appeals Council must show in its written denial that it has adequately evaluated the new evidence." *Flowers v. Comm'r of Soc. Sec.*, 441 F.App'x. 735, 745 (11th Cir. 2011) (citing *Epps v. Harris*, 624 F.2d 1267, 1273 (5th Cir. 1980)[1]). The Appeals Council's denial of review of new evidence is a decision that is subject to judicial review. *Keeton v. Dep't of Health & Human Servs.*, 21 F.3d 1064, 1066 (11th Cir. 1994).

The evidence from Dr. Wright is new, as it was not previously submitted to the ALJ. *Hyde*, 823 F.2d at 459; R. 60-62. The evidence is chronologically relevant, as it relates to Plaintiff's condition before the ALJ issued her opinion in April 2022. *Hyde*, 823 F.2d at 459; R. 60-62 (stating that Plaintiff had been receiving treatment for her depression since 2020 and in treatment with this provider since February 2022).[2] Plaintiff argues that the evidence is material because the ALJ concluded that Plaintiff's depressive disorder and post-traumatic stress disorder were non-severe impairments, and Plaintiff's RFC did not include any mental health limitations. R. 118, 112.

---

[1] Decisions of the former Fifth Circuit issued on or before September 30, 1981, are binding precedent in the Eleventh Circuit. *Bonner v. City of Prichard,* 661 F.2d 1206, 1209 (11th Cir.1981).

[2] The Commissioner argues that Plaintiff "is not challenging the Appeals Council's evaluation of the evidence, which it indicated was not time relevant." (Doc. 11 at 10). Although Plaintiff did not make a clear argument related to the chronological relevance of this evidence, the evidence facially refers to the relevant period. R. 60-62. Further, Plaintiff refers to her mental health condition on February 18, 2022, and April 26, 2022, both dates within the relevant period cited from the new mental health records, when arguing that the new evidence met the standards of "'new and material evidence' that '*relates to the period on or before the date of the administrative law judge's hearing decision.*'" (Doc. 10 at 15-16; 13 (emphasis added)).

Plaintiff argues that the opinion of Dr. Wright supports a finding that Plaintiff meets Listing 12.04 for depressive, bipolar, and related disorder, which the ALJ did not consider when issuing the decision.  R. 118-21; (Doc. 10 at 14-15).  Listing 12.04 requires (1) depressive disorder, which is characterized by five or more of the following symptoms: depressed mood; diminished interest in almost all activities; appetite disturbance with change in weight; sleep disturbance; observable psychomotor agitation or retardation; decreased energy; feelings of guilt or worthlessness; difficulty concentrating or thinking; or thoughts of death or suicide; and (2) extreme limitation of one, or marked limitation of two, of the follow areas of mental functioning: understanding, remembering, or applying information; interacting with others; concentrating, persisting, or maintaining pace; and adapting or managing oneself.  Listing 12.04.  Dr. Wright issued an opinion which states that Plaintiff has a depressed mood, diminished interest in almost all activities, appetite disturbance with change in weight, sleep disturbance, observable psychomotor agitation or retardation, decreased energy, feelings of guilt or worthlessness, difficulty concentrating or thinking, and that she had previously had thoughts of death or suicide. R. 60.  Dr. Wright also opined that Plaintiff had a moderate limitation in understanding, remembering, or applying information; a marked limitation in interacting with others; an extreme limitation in concentrating, persisting, or maintaining pace; and a marked limitation in adapting or managing herself.  R. 61.

As Plaintiff argues, the evidence before the ALJ related to Plaintiff's mental health does not discount this opinion.  Plaintiff had been treated by her primary care physician for depression since 2020.  R. 62.  Plaintiff's depression is consistently reported in her medical records and Plaintiff reported it during the hearing before the ALJ.  *See* R. 611; 157.  Although the opinion of Dr. Wright is more extreme than previous evidence related to Plaintiff's mental health, it is also

more in-depth than other evidence related to Plaintiff's mental health.   Accordingly, there appears to be a reasonable possibility that this new evidence regarding Plaintiff's mental health may change the administrative result of this case, which makes the evidence material.  *Hargress*, 883 F.3d at 1309. Remand on this basis is appropriate.

The new evidence from Dr. Jingo, which Plaintiff also argues warrants remand, lacks such materiality.   Although the evidence is new and chronologically relevant, the Appeals Council found that it lacked materiality as it did not show a reasonable probability that it would change the outcome of this decision.   This assessment was correct, and the Appeals Council properly rejected this evidence.  R. 2.  Unlike the evidence related to Plaintiff's mental health, which was less developed in the record and did not result in any limitations in Plaintiff's RFC, Plaintiff's physical health issues were extremely well developed in the record and addressed in the ALJ's decision.   The new evidence from Dr. Jingo specifically assesses Plaintiff's physical capabilities in light of her reported physical conditions, lists Plaintiff's medications, and lists Plaintiff's symptoms.  R. 20-27.  This does not substantially add any new information to the evidence, as Plaintiff's medications and symptoms were well described by all of the previous treatment records from Dr. Jingo and other providers, and Plaintiff herself described her physical limitations in detail during the hearing before the ALJ.  R. 153-57.  Further, Dr. Jingo completed a substantially similar assessment that was included in the evidence submitted to the ALJ.  R. 778-83.  Plaintiff has not demonstrated that this new evidence has a reasonable possibility of changing the administrative outcome of this case.  Therefore, this evidence has not been shown to be material, and remand is not appropriate.

## CONCLUSION

Plaintiff presented new and material evidence related to Plaintiff's mental health which undermined the ALJ's decision, and the Appeals Council improperly rejected this evidence. Accordingly, the Commissioner's decision in Plaintiff's case is **REMANDED** under sentence six of 42 U.S.C. § 405(g) for evaluation of that evidence.

**SO ORDERED**, this 27th day of March, 2024.

s/ Charles H. Weigle
Charles H. Weigle
United States Magistrate Judge